IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRIAN H. GORME, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-17-1095 |
| | § | |
| NANCY A. BERRYHILL, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION,[1] | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court[2] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 14) and Defendant's Cross Motion for Summary Judgment (Document No. 15) and Brief in Support (Document No. 16). After considering the cross motions for summary judgment, the administrative record, the written decision of the Administrative Law Judge, and the applicable law, the Court ORDERS, for the reasons set forth below, that Plaintiff's Motion for Summary Judgment is GRANTED, Defendant's Motion for Summary Judgment is DENIED, and this matter is REMANDED to the Commissioner for further proceedings.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted for Carolyn W. Colvin as the defendant in this case.

[2] On April 17, 2018, pursuant to the parties' consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 11.

## I. Introduction

Plaintiff Brian H. Gorme ("Gorme") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for supplemental security income benefits. In one claim, Gorme argues that "Defendant's ruling is not supported by substantial evidence." The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's decision, that the decision comports with applicable law, and that the decision should be affirmed.

## II. Procedural History

On August 23, 2012, Gorme filed an application for supplemental security income benefits ("DIB"), claiming that he had been unable to work since January 1, 2005, as a result of memory loss, vision problems, neck and back pain, and attention problems (Tr. 236-266). The Social Security Administration denied his application at the initial and reconsideration stages. After that, Gorme requested a hearing before an ALJ. The Social Security Administration granted his request and the ALJ, Gary J. Suttles, held a hearing on March 26, 2014, which was re-convened on April 10, 2015, at which Gorme's claims were considered *de novo*. (Tr. 44-85; 86-133). Thereafter, on June 26, 2015, the ALJ issued his decision finding Gorme not disabled. (Tr. 17-39).

Gorme sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or

conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 416.1470. On February 9, 2017, the Appeals Council found no basis for review (Tr. 1-3), and the ALJ's decision thus became final.

Gorme filed a timely appeal of the ALJ's decision. 42 U.S.C. § 405(g). Both sides have filed a Motion for Summary Judgment, each of which has been fully briefed. The appeal is now ripe for ruling.

### III. Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts

in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the

immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the

claimant is or is not disabled, the evaluation ends. *Leggett,* 67 F.3d at 563.

Here, the ALJ found at step one that Gorme had not engaged in substantial gainful activity since August 23, 2012, the date of his SSI application. At step two, the ALJ determined that Gorme had "a severe mental impairment diagnosed as schizophrenia." At step three, the ALJ concluded that Gorme did not have an impairment or a combination of impairments that met or equaled a listed impairment, including Listings 12.03 and 12.04. Prior to consideration of steps four and five, the ALJ determined that Gorme had the "residual functional capacity to perform a full range of work at all exertional levels," except that he can have only "occasional exposure to dangerous machinery[,]" "can understand, remember and carry out simple, 1 and 2 step, instructions[,]" and "can concentrate and perform simple tasks, respond and adapt to work-place changes and to supervision, in an occasional public and employee contact setting." (Tr. 33). At step four, the ALJ found that Gorme had no past relevant work. At step five, using the residual functional capacity assessment, and based on the testimony and opinions of a vocational expert, the ALJ concluded that there were jobs in significant numbers in the regional and national economy that Gorme could perform, including kitchen helper, sweeper cleaner, and folding machine operator, and Gorme was, therefore, not disabled.

In this appeal, Gorme argues that substantial evidence does not support the ALJ's decision at step three. In particular, Gorme argues that the ALJ failed to properly consider and weigh all the evidence in the record, which supported the applicability of Listing 12.03.

## V. Discussion

According to Gorme, the evidence in the record, including his thirty day hospitalization, the results of Dr. Harper's consultative examination, and the testimony of his brother, Dr. Neil Gorme, and the medical expert, Dr. Nancy Tarrand, at the administrative hearing all supported a determination that he met or equaled Listing 12.03. Having reviewed the evidence in the record against the requirements of Listing 12.03, as well as the ALJ's rationale and explanation for his determination that Gorme did not meet Listing 12.03, the Court concludes, for the reasons that follow, that substantial evidence does not support the ALJ's step three finding.

Listing 12.03 provides for presumptive disability as follows:[3]

> 12.03 *Schizophrenic, Paranoid and Other Psychotic Disorders*: Characterized by the onset of psychotic features with deterioration from a previous level of functioning.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
> A. Medically documented persistence, either continuous or intermittent, of one or more of the following:
> 1. Delusions or hallucinations; or
> 2. Catatonic or other grossly disorganized behavior; or
> 3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:
>     a. Blunt affect; or
>     b. Flat affect; or
>     c. Inappropriate affect; or
> 4. Emotional withdrawal and/or isolation.
> AND
> B. Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration;
> OR

---

[3] This is the text of Listing 12.03 as it existed on June 25, 2015, the date of the ALJ's decision.

C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychological support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Gorme maintains that the ALJ erred, and his decision is not supported by substantial evidence insofar as he determined that Gorme did not meet the "B" criteria of Listing 12.03.

In determining that Gorme did not meet Listing 12.03, the ALJ wrote:

The severity of the claimant's mental impairment does not meet or medically equal the criteria of listing 12.03 for schizophrenia, paranoid or other psychotic disorders or any other plausibly applicable mental listing. The claimant's schizophrenia does not, I decide, cause him listing level effects on his life, that is, the "B" criteria for listing 12.03, which are common to all other plausibly applicable mental impairment listings, particularly listing 12.04 for affective disorders, under which a schizoaffective disorder would more properly be applicable, are not met. Similarly none of the "C" criteria for listing 12.03 or for any other plausibly applicable listing are met.

In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

The claimant's schizophrenia, I decide, causes him moderate restrictions in his activities of daily living, moderate difficulties in social functioning and moderate difficulties in maintaining concentration, persistence or pace, with no episode of extended duration of decompensation. I particularly focus on the causation requirement, and cannot conclude that the claimant has proved that his mental

8

impairment had caused him more significant limitations or difficulties that I decide and state in this decision.

In activities of daily living, the claimant has moderate restriction. The claimant's testimony as to his activities of daily living is that he takes care of his own hygiene and grooming, dresses himself, prepares simple meals, drives his mother's car, and runs errands. He cares for the needs of an older man, but at the same time states he cannot care for himself? At the April 2015, hearing, the claimant did not testify to any different limitations. Even Dr. Harper notes the claimant described no specific self-care limitations or inability to perform most ordinary instrumental activities of daily living. I agree. Given that conclusion, I see no reason he could not perform work involving simple tasks and instructions within an occasional public/employee setting.

In social functioning, the claimant has moderate difficulties arising from his mental impairment. The claimant lives with his mother, who is now 82 years of age. He seldom interacts with his siblings, and his father lives in a foreign country. The claimant has no friends in the local area, and keeps in touch with 1 person who has moved away. At the April 2015 hearing, the claimant testified he assisted an elderly man with his going and coming, and that this man was his only local friend. The claimant's testimony establishes, I find, that he has become isolated and has essentially no social life. However, it does not indicate any antagonistic relations with others, such as feuds or fights, nor does he avoid contact or socializing with others. I do note the claimant's sister, who brought him to Dr. Harper for the examination, appeared uncomfortable and hesitant about accompanying him into the interview, but there is no note that she was uncomfortable with him in the trip to Dr. Harper and back to their mother's home. This, I consider, marks a difference between moderate difficulties and marked difficulties.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. On the examinations, even the examination by Dr. Harper, the claimant was able to complete the Wechsler IQ test and the Minnesota Multi-Phasic personality Inventory, though his profile on this latter was invalid; his visual attention and vigilance score and tracking ability were both within normal limits, if marginally so, for a single response set, though he was so impaired attempting to alternate between different sequencing strategies that he could not complete the test in time. As the ability to concentrate and persist and set pace is concerned with job performance requirements, the claimant's ability to perform in simpler tasks seems to indicate moderate limitations instead of marked ones, but certainly would not eliminate all jobs that exist in the national economy, although it may likely lead to signification reductions the range of jobs available to the claimant.

(Tr. 30-31). While the ALJ did conduct a thorough and comprehensive review of the evidence, his

assessment of the "B" criteria of Listing 12.03 came down to his disagreement with Dr. Tarrand's testimony at the administrative hearing. The ALJ explained that disagreement in his decision as follows:

> At the March 2014 hearing, Dr. Tarrand testified on the step three questions also. On the questions of the "B" criteria, Dr. Tarrand testified that as to the claimant's activities of daily living, in his home setting, his restrictions were moderate; as to his social functioning, if the social functioning was stressful, his difficulties would be marked; as to concentration, persistence or pace, on a sustained basis the claimant would have marked difficulties. As to deterioration, the only documented episode for the claimant was outside the relevant time period. As to the "C" criteria, Dr. Tarrand testified that the C2 criterion (common to all the plausibly applicable listings, including 12.04 for affective disorders) would apply, as even a minimal increase in mental demands would be predicted to cause the claimant to decompensate.
>
> Dr. Tarrand did not testify on these questions at the April 2015, hearing, even when the claimant, through his representative, was given the opportunity to and did examine her – he did not even ask her if she continued in her opinion as to the listing level severity of the claimant's mental impairment she had testified to at the March 2014 hearing.
>
> The claimant, through his representative, contends that Dr. Tarrand's testimony on these questions, with Dr. Harper's report as its basis, should be credited and the claimant found disabled on this basis.
>
> I do not agree, and note the conditional nature of Dr. Tarrand's testimony in March 2014. As to the "B" criteria, I note that Dr. Tarrand testified that if the social functioning was stressful, the claimant's difficulties would be marked; as to his concentration, persistence or pace, Dr. Tarrand testified that if the claimant was required to do so on a sustained basis, then his difficulties would be marked. Dr. Tarrand, I note, did not testify about the claimant's social functioning in non-stressful situations, such as pleasant family life or non-stressful public activities, nor did she testify that all social relations would be stressful for the claimant. I find in social situations [ ] involving occasional public/employee contact, they would be compatible with a moderate, not marked, environment to which the claimant could successful[ly] function. The situations considered for evaluating social functioning are interactions with family members, friends, neighbors, grocery clerks, landlords and bus drivers – not so many of which are likely to present sustained or stressful relationships. I note that none of these are employers or supervisors or customers, the people the claimant has had difficulty with in the past.

> As to the claimant's concentration, persistence or pace, I simply note that the sustained attention considered is the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. I disagree with Dr. Tarrand's testimony, in that regard, and find the claimant, based on his actual activities, thoroughly discussed above, could perform at least simple tasks and understand simple, 1-2 step instructions as proffered in my established residual functional capacity below.

(Tr. 31-32).

The ALJ's decision at step three, in addition to failing to provide a fair assessment of Dr. Tarrand's testimony and opinions, disregards the other evidence in the record as to the severity of the restrictions on Gorme's social functioning, and his ability to maintain concentration, persistence or pace. As set forth above, the ALJ found that Gorme had moderate- not marked - difficulties in maintaining social functioning and maintaining concentration, persistence or pace. Marked difficulties are considered "more than moderate but less than extreme." The regulations further provide that "[a] marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00 C. Here, the ALJ's discernment that Gorme's difficulties were moderate, and not marked, is not supported by substantial evidence.

Dr. Tarrand, an impartial medical expert, testified at the initial administrative hearing on March 26, 2014, that Gorme would meet Listing 12.03 for schizophrenia (Tr. 120-121); that it was not unusual for Gorme not to have been treated for "almost 24 years" because "[n]ot all schizophrenia is alike. Not everyone who has schizophrenia is a raving lunatic who is causing a lot of problems. Some people are quietly psychotic. If they're not bothered or disturbed, they tend to isolate themselves from other people, stay in their room, maybe are capable of doing a few chores

11

for mom and dad, and they're kept at home" (Tr. 123); and that "[t]here's very little treatment for the negative symptoms of schizophrenia, so had he gone to the doctor and received anti-psychotics for all these years, I have very little reason to believe that it would have impacted the overall course of illness because our medications only treat delusions and hallucinations. They don't treat his lack of ability to make himself get up and do things that are routine and boring and everyday sort of things like going to work because he just doesn't have the motivation to conform to that sort of behavior pattern" (Tr. 124). She also testified in response to specific questions from Gorme's attorney that Gorme had "marked" difficulties with concentration, persistence and pace, and would have marked difficulties with social functioning if he was in a setting that was more stressful than his current one (Tr. 128).[4] At the reconvened hearing on April 10, 2015, Dr. Tarrand further testified that:

> Now, I think that the picture is very classic for what we would refer to as burned out schizophrenia or residual schizophrenia because the symptoms of that condition are not the same as the florid psychosis that one sees in a younger individual. Middle aged people who have gone through schizophrenia and then something changes in middle age, though we don't yet know what it is, but their symptoms become more negative and you don't see the screaming [INAUDIBLE] and being hauled off to the hospital by the police, but you see more this kind of withdrawal and apathy and lack of interest in the kinds of things that people need to be interested in in order to get themselves up and go to work every day, and I think that we see that in this Claimant, and I think we – we hear it in his testimony today, one of the things that he told you about looking up or reading or doing, he said I don't really do that much anymore. And I think it's very hard to get an idea of really exactly what he does do, although clearly I did hear that he does apparently drive his mother to the hospital – to the – to the doctor and maybe [INAUDIBLE]. I don't think that he would have the kind of persistence to be able to maintain a job. The – the negative symptoms of

---

[4] Dr. Tarrand testified that Gorme's difficulties with social functioning in his *current* setting – described by Gorme and his brother as being at home with very little contact with family and friends – would be moderate, but that "if he were in a social functioning setting where there were more stressful [sic], *where someone made demands on him*, that likely his difficulty in that setting would be marked." (Tr. 128) (emphasis added). While Tarrand did not clearly and directly testify that Gorme would have marked difficulties in any social setting other than his current one, her testimony suggests as much.

12

schizophrenia, the amadonia [phonetic] of the lack of motivation, the tendency to be very inwardly directed and not really emotionally connected to the world, the tendency to not really have any drive to accomplish anything. These are the sorts of things that – that really hamper people's ability to work more than hearing voices in a lot of cases. The negative symptoms are very hard to treat and they really don't get as much attention from lay people as the florid positive symptoms which tend to result in the police being called and the hospitalizations. So in my opinion, that's the picture we have in this individual and I think that the – essentially living at home in a back bedroom at his mom's house for his entire adult life is also very consistent with that, especially in a family that where financially, this is not really that much of a burden for them. It's the path of least resistence, and it's often the easiest path for the family to take, to just keep this individual at home. They don't want to go to treatment. Parents get very tired of trying to make them go, and eventually they settle into this pattern and then when mom gets very, very old, the siblings go, oh my gosh, we have to do something about whatever the name of the sibling is who's left there still living in the back bedroom, and then we see exactly the picture that we see here. And that's – that's my take on it, which was pretty much the same opinion I had last time.

(Tr. 76-78). In addition to Dr. Tarrand's testimony and opinions, which directly aligned with the considerations to be made on the "B" criteria of Listing 12.03, the record contains the findings and opinions of Dr. Robert Harper, who conducted a comprehensive psychological evaluation of Gorme on March 13, 2013. The findings of Dr. Harper that are pertinent to the "B" criteria of Listing 12.03, but were not discussed by the ALJ in his step three determination, include the following:

- His affect was flat and he interacted at times in a robotic manner. His eye contact was variable. . . . His stream of mental consciousness could not be clearly assessed, particularly if there was any [ ] distraction with internal stimuli, which at times appeared to be the case.

- His tendency to provide distorted definitions of words within his IQ level was extremely peculiar and suggested the presence of a residual thought disturbance.

- His visual attention/vigilance and tracking was marginally within normal limits for a single response set, but he was quite impaired attempting to alternate between different sequencing strategies, becoming quite derailed such that the task was discontinued with a time far outside the normal range. As this might suggest possible executive cognitive deficits he was administered a self-report inventory of executive cognitive functions and

13

normal routines and indeed Mr. Gorme acknowledged problems with the
ability to shift between activities, to initiate goal oriented behavior, utilize
working memory and with planning/organizing and task monitoring.

- Because of Mr. Gorme's very bizarre verbalizations and erratic behavior he
was administered the Rorschach Inkblot Test in which he generated many
responses involving "alien" or "space creatures." There was some indications
of idiosyncratic logic suggestive of a low grade thought disturbance.

- Of the Brief Symptom Inventory, a psychological symptom survey, Mr.
Gorme described moderate depression but more prominent paranoid
mentation, anger-irritability, and marked obsessive-compulsive ruminations.
Significant emotional alienation is also described.

- While he does not evidence a full-blown thought disturbance producing
psychotic, disorganized behavior requiring acute intervention, there are
nonetheless indications of disordered reasoning and associations, and deficits
in intellectual memory and executive cognitive functions that reflect a
chronic mental illness.

- Given his acute psychosis documented in the 1990s, and the progression of
his adaptive decline, a residual simple schizophrenia, currently untreated
(because of the paranoid elements of his illness), has rendered this individual
incapable of functioning [on] a competitive [or] sustained basis.

(Tr. 314-315). Finally, there is the testimony of Gorme and his brother, Dr. Neil Gorme, at the administrative hearing about Gorme's limitations,[5] as well as the descriptive and anecdotal evidence of Gorme's limitations that were provided by Gorme's mother to Dr. Harper, and included as background information in his report.[6] All of that evidence supports the specific opinions offered

---

[5] Dr. Neil Gorme testified at the hearing that Gorme's family has tried to for years to get Gorme "to maintain a structured lifestyle," but each attempt has been met with Gorme becoming very agitated and disengaged. (Tr. 107, 109). He also testified that Gorme's family can only engage with him on a "very superficial basis." (Tr. 109).

[6] Dr. Harper's report contains the following information he obtained from Gorme's mother, who he interviewed by phone:
> Mrs. Gorme indicated that she underwrote his psychiatric aftercare for several years with a psychiatrist who hospitalized him. He was noncompliant with his medication and lack of insurance funds prevented continuation of his care, which she doubts he

14

by Dr. Tarrand on the "B" criteria of Listing 12.03 that Gorme has marked difficulties maintaining social functioning and marked difficulties maintaining concentration, persistence or pace, but none of it was discussed by the ALJ *at step three*. Moreover, other than disagreeing with the opinions of Dr. Tarrand, and stressing that Gorme had not sought mental health treatment for decades, the ALJ pointed to no specific evidence in the record that supports his step three determination. Although there is no dispute, whatsoever, that Gorme has not been treated for his mental impairment in over two decades, and has not been on any kind of psychiatric medication over that period of time, Gorme's lack of treatment cannot be used by the ALJ to completely override all the evidence in the record that supports the "B" criteria of Listing 12.03.

For that reason, and because "substantial" evidence does not support the ALJ's decision at step three, the Court concludes that remand is warranted for further consideration of Gorme's mental impairment and whether that impairment meets or equals any impairment listed in Appendix 1 of the Regulations, including, without limitation, Listing 12.03.

---

would have pursued in any event. She believes he had one additional psychiatric hospital admission at a MHMRA facility on the urging of a friend of his. He has remained at home dependent upon her and she confirmed that he had been unable to consistently sustain any purposeful activity, let alone gainful employment. By her report, he remains not actively psychotic but chronically dysfunctional, prone to occasional anger outbursts, and unable to organize himself for any purposeful activity. This would be consistent with a picture of chronic schizophrenia with predominantly negative symptoms. Mrs. Gorme indicated that her son was "obsessive-compulsive" as a child preoccupied with repetitive thoughts (it is suspected this may have represented a prodome of his more prominent thought disturbance that was evident in his first mental breakdown and psychiatric hospitalization).

(Tr. 313).

## VI. Conclusion and Order

Based on the foregoing, and the absence of substantial evidence to support the ALJ's determination at step three, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 14) is GRANTED, Defendant's Motion for Summary Judgment (Document No. 15) is DENIED, and this case is REMANDED to the Social Security Administration pursuant to 42 U.S.C. § 405g, for further proceedings consistent with this opinion.

Signed at Houston, Texas, this 24th day of August, 2018.

_____
FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE